# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 47

APRIL TERM, A.D. 2013

April 24, 2013

DHARMINDER VIR SEN,

Appellant
(Defendant),

v.

No. S-11-0151

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sheridan County*
*The Honorable John G. Fenn, Judge*

*Representing Appellant:*

> Diane E. Courselle, Director, and Samantha Lind, Cally Lund, and Brian Quinn, Student Interns, Defender Aid Program, University of Wyoming College of Law. Argument by Ms. Lind.

*Representing Appellee:*

> Gregory A. Phillips, Attorney General; David L. Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Justin A. Daraie, Assistant Attorney General. Argument by Mr. Daraie.

*Before KITE, C.J., and GOLDEN,\* HILL, VOIGT, and BURKE, JJ.*

*\*Justice Golden retired effective September 30, 2012.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BURKE, Justice.**

[¶1]   Appellant, Dharminder Sen, was convicted of first-degree felony murder, aggravated burglary, and conspiracy to commit aggravated burglary for his participation in the killing of Robert Ernst after breaking into Mr. Ernst's home with Wyatt Bear Cloud and Dennis Poitra, Jr.[1]   He challenges his convictions on a number of grounds, and contends that his sentence of life without the possibility of parole is unconstitutional under the United States Supreme Court's recent decision in *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).   We affirm Sen's convictions.   However, in light of the decision in *Miller v. Alabama*, and our recent decision in *Bear Cloud v. State*, 2013 WY 18, 294 P.3d 36 (Wyo. 2013) (*Bear Cloud II*), we agree that Sen's sentence for first-degree felony murder was issued pursuant to a sentencing scheme that violated the Eighth Amendment's prohibition against cruel and unusual punishment.   As a result, we vacate Sen's sentence of life without the possibility of parole.   Further, because Sen's sentence of life without the possibility of parole may have impacted the sentencing decisions with respect to his conspiracy and aggravated burglary convictions, we vacate those sentences and remand for resentencing on all counts.

## *ISSUES*

[¶2]   Sen presents six issues, which we discuss in the following order:

1. Did the trial court abuse its discretion when it failed to grant Dhar Sen's motion to transfer his case to juvenile court, where the court did not meticulously consider the evidence, made inadequate findings, and made serious mistakes weighing the relevant factors?

2. Did the trial court err when it denied Dhar Sen's motion to suppress his confession where the confession was involuntary as the product of coercion and failure to knowingly and intelligently waive his right to an attorney?

3. Did the trial court err when it found that the gunshot residue kit obtained without a warrant was admissible at trial?

4. Whether excluding expert testimony by Dr. Marie Banich, offered for the purpose of calling into question the specific

---

[1] *See Bear Cloud v. State*, 2012 WY 16, 275 P.3d 377 (Wyo. 2012) (*Bear Cloud I*) and *Poitra v. State*, 2012 WY 58, 275 P.3d 478 (Wyo. 2012), affirming Bear Cloud's and Poitra's convictions.

1

intent element of aggravated burglary (and felony murder), violated Dhar Sen's Sixth Amendment right to present a defense?

5. Whether Dhar Sen was denied effective assistance of counsel due to his attorney's failure to investigate and failure to raise significant issues at sentencing?

6. Whether a sentence of life imprisonment without the possibility of parole or commutation, for a homicide committed at the immature age of 15, violates Dhar Sen's constitutional protection against cruel and unusual punishment under the United States and Wyoming Constitutions?

The State phrases the issues in a substantially similar manner.

## *FACTS*

[¶3]    On the evening of August 25, 2009, Sen, Wyatt Bear Cloud, and Dennis Poitra, Jr., met at Bear Cloud's residence in Sheridan, Wyoming and planned a series of armed burglaries.   While at Bear Cloud's residence, they gathered materials to carry out the burglaries.   The materials consisted of a map, a knife, a two-by-four, dark clothing, bandannas, flashlights, and a gun that Sen and Bear Cloud had stolen from a pickup several days earlier.   In the early morning hours of August 26, Sen, Bear Cloud, and Poitra entered the home of Robert and Linda Ernst with the intent to steal items from the home.  After searching several rooms in the house, Sen obtained the gun from Poitra in order to induce the Ernsts to open a safe located in the basement.   After waking Mr. Ernst, Sen yelled at him and then shot him three times, killing him.   The three then fled back to Bear Cloud's residence.

[¶4]    Following an investigation, Sen was charged with first-degree felony murder, in violation of Wyo. Stat. Ann. § 6-2-101(a) (LexisNexis 2009), conspiracy to commit aggravated burglary, in violation of Wyo. Stat. Ann. §§ 6-1-303(a) and 6-3-301(a) and (c)(i), and aggravated burglary, in violation of Wyo. Stat. Ann. § 6-3-301(a) and (c)(i). On October 27, 2009, he pled "not guilty" to the charged offenses.  Two months later, Sen filed a motion to transfer the case to juvenile court.  He claimed that his lack of maturity and his prospects for rehabilitation weighed in favor of transfer.  The district court denied the motion after holding a hearing at which it received testimony relating to cognitive development of teenagers generally, documentation of Sen's psychological evaluations, and testimony regarding the details of the alleged crimes.

[¶5]    Prior to trial, Sen also submitted several motions to suppress evidence, two of which are relevant to the issues raised in this appeal.  In the first motion, Sen sought to

suppress statements made during a custodial interrogation. He asserted that his confession to the alleged crimes was the product of unlawful coercion. In the other motion, Sen urged the district court to suppress evidence obtained from a gunshot residue test. He claimed that administration of the test during his interrogation constituted an unreasonable warrantless search. After a hearing, the district court denied the motions.

[¶6]    At a status hearing held on April 6, 2010, the district court allowed Sen to supplement his "not guilty" plea with a plea of "not guilty by reason of mental impairment or deficiency." As a result, the court ordered a mental evaluation pursuant to Wyo. Stat. Ann. § 7-11-304(d) to determine Sen's mental capacity at the time of the alleged offenses. An examiner from the State Hospital determined that Sen met the criteria for diagnoses of depressive, anxiety, and conduct disorders, but concluded that there was "no demonstrable link between his mental health problems and his capacity to appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law."

[¶7]    After learning that Sen planned to introduce expert testimony at trial relating to the cognitive capacity of teenagers, the State filed a motion in limine to exclude the evidence. The State contended that the proposed expert testimony would be irrelevant because a "diminished capacity" defense is not recognized in Wyoming. The district court heard argument on the motion, but deferred ruling until the defense presented further details regarding the proposed testimony. The court readdressed the issue during trial and, after receiving an offer of proof from the defense, determined that the proposed testimony was inadmissible.

[¶8]    At the conclusion of the trial, the jury found Sen guilty of each of the charged offenses. The court sentenced Sen to life imprisonment without parole for the first-degree felony murder conviction, 20 to 25 years imprisonment for the aggravated burglary conviction, to be served consecutively to the life sentence, and 20 to 25 years imprisonment for the conspiracy to commit aggravated burglary conviction, to be served consecutively to the other two sentences. Sen timely filed this appeal. While the appeal was pending, the United States Supreme Court issued its decision in *Miller v. Alabama*, which held that *mandatory* life without parole for those under the age of eighteen at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments. In light of that decision, we granted Sen's request for supplemental briefing on the constitutionality of his sentence. Additional facts will be set forth as necessary in our discussion of the issues.

## DISCUSSION

### I.    Motion to Transfer to Juvenile Court

[¶9]    In his first challenge to his convictions, Sen contends the district court erred in denying his motion to transfer the case to juvenile court. Pursuant to Wyo. Stat. Ann. §

3

14-6-203(f)(iv), cases in which the defendant is a minor who has reached the age of fourteen and has been charged with a violent felony may originally be commenced either in the juvenile court or in the district court. If a case is commenced in district court, the court may order a transfer hearing to determine if the matter should be transferred to juvenile court. Wyo. Stat. Ann. § 14-6-237(a). We review the ruling on a motion to transfer for an abuse of discretion. *Rubio v. State*, 939 P.2d 238, 241 (Wyo. 1997).

[¶10] The factors to be considered by a judge in determining whether to transfer a case to juvenile court are set forth in Wyo. Stat. Ann. § 14-6-237(b):

> (b) The court shall order the matter transferred to the appropriate court for prosecution if after the transfer hearing it finds that proper reason therefor exists. The determinative factors to be considered by the judge in deciding whether the juvenile court's jurisdiction over such offenses will be waived are the following:
>
> > (i) The seriousness of the alleged offense to the community and whether the protection of the community required waiver;
> >
> > (ii) Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
> >
> > (iii) Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted;
> >
> > (iv) The desirability of trial and disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults who will be charged with a crime;
> >
> > (v) The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living;
> >
> > (vi) The record and previous history of the juvenile, including previous contacts with the law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this court, or prior commitments to juvenile institutions;

(vii) The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the juvenile court.

[¶11] Sen contends the district court abused its discretion in denying his transfer motion because the court failed to "meticulously examine the evidence" and made "serious mistakes in weighing the relevant factors." Although Sen acknowledges that there "is no dispute that this case involved a serious offense, and resulted in the death of Mr. Ernst," he asserts that the district court failed to consider that proceedings in juvenile court could offer meaningful community protection. Sen also claims that the court "significantly overemphasized the premeditation and willful" aspects of the offense. He acknowledges that he and his cohorts acquired deadly weapons, changed into dark clothing, and used a map to plan their criminal activities, but contends that "These are not actions reflecting a pre-meditated and carefully planned crime, these are actions of teens reacting spontaneously." According to Sen, the district court "could not have found that the actions of the defendant were willful or premeditated." Sen also asserts that "the court failed to consider that, because his character is not fully formed, Dhar has the innate potential for rehabilitation and change." Finally, Sen contends that the court "significantly over-emphasized the extent of [Sen's] record." He claims that "Because even the court thought there should have been more juvenile court intervention, it should have discounted the impact of [Sen's] priors and weighted this factor in favor of transfer[] to juvenile court."

[¶12] At the transfer hearing, the district court received documentary evidence and testimony relating to the nature of the alleged offenses, Sen's prior criminal record, Sen's cognitive capacity, and the brain development of juveniles generally. Dr. Marie Banich testified that maturation of the adolescent brain takes much longer than scientists had previously thought and that several "executive functions" are relatively underdeveloped in a teenager's brain, including the ability to plan behavior and appreciate consequences, the ability to control actions "internally instead of being distracted by outside influences," and the ability to process and evaluate risk. Sen also presented the testimony of Dr. Ronna Dillinger, who conducted a psychological evaluation for the transfer hearing. Her evaluation included a review of Sen's family history and childhood development, as well as an assessment under the "risk-sophistication-treatment inventory," which evaluates three domains of characteristics that are specifically tailored to assist the court in making a transfer decision. Those domains include an assessment of the defendant's future dangerousness, maturity level, and amenability to treatment. Dr. Dillinger testified that Sen scored in the "average" or "moderate" range in all three domains. Dr. Dillinger also testified that Sen's IQ was in the low average range. Finally, the district court also received testimony from Agent Chad Quarterman, the co-lead investigator of the murder, who described the facts relating to the planning and execution phases of the crime. His

5

testimony noted Sen's agreement with his co-conspirators to participate in a burglary, the gathering of items to be used as weapons, Sen's effort to conceal his identity, the use of a map to plan the location of their criminal activity, and Sen's role in demanding the gun from Poitra and shooting the victim.

[¶13] In light of the testimony introduced at the transfer hearing, the district court concluded that the factors identified in Wyo. Stat. Ann. § 14-6-237(b) weighed against transfer of the case to juvenile court. With regard to the first factor, the court noted that first-degree murder "is the most serious in nature of all criminal offenses" and that the need for community protection was "very high." As to the second factor, the court stated that based on the facts alleged, "we have very aggressive, very violent, and significantly premeditated and willful criminal conduct attributable to the defendant in this case." After noting that the third factor also weighed against transfer because the alleged offense resulted in the death of Mr. Ernst, the court noted that the first three factors weighed "very heavily towards this case being in adult court." The district court found the fourth factor to be neutral. Addressing the fifth factor, the district court noted that Sen's lack of sophistication and maturity was a "key factor" for the defense. It acknowledged the testimony regarding juvenile brain development, as well as the testimony indicating that Sen had a low average IQ and an average degree of maturity for his age. However, the court also noted the sophistication necessary to the planning, preparation, and execution of the criminal actions which led to the killing of Mr. Ernst. With regard to the sixth factor, the court found that Sen's "significant" criminal history, which included violations for hit and run, flight to avoid arrest, shoplifting, unauthorized use of a motor vehicle, disorderly conduct, and disturbing the peace, demonstrated an "ongoing violation of law." Finally, in addressing the seventh factor, the court stated that it was "persuaded that there are some matters in this particular case that would attend to the rehabilitation possibilities" and that it had given those possibilities due consideration. After weighing all of the relevant factors, however, the court concluded that the case should remain in district court.

[¶14] The record shows that the district court thoroughly reviewed the evidence relating to each of the factors identified in Wyo. Stat. Ann. § 14-6-237(b), and gave due consideration to Sen's immaturity and potential for rehabilitation. Those factors, however, were outweighed by the factors relating to Sen's history of criminal conduct, and the nature and severity of the alleged offense. We find no basis to conclude that the district court made "serious mistakes in weighing the relevant factors," as Sen contends. Addressing a similar argument in *Bear Cloud v. State*, 2012 WY 16, ¶ 36, 275 P.3d 377, 392 (Wyo. 2012) (*Bear Cloud I*), we stated that

> While Bear Cloud may assert that the court *should have* weighed the evidence differently, that function belongs to the trial court and will not be disturbed absent an abuse of discretion. *See Hansen v. State*, 904 P.2d 811, 828 (Wyo. 1995). Quite frankly, it is hard to conceive that a district court

6

would conclude that Bear Cloud's case would be better resolved in juvenile court given the particularly unique and egregious nature of the crimes involved.

(Emphasis in original.) Our observation in that case applies with greater force in the present appeal, considering the fact that it was Sen who shot and killed Mr. Ernst after demanding the murder weapon from Poitra. We find no abuse of discretion in the district court's decision to deny Sen's transfer motion.

## II. Motion to Suppress Confession

[¶15] In his next issue, Sen claims that incriminating statements made during a custodial interrogation were involuntary and should not have been admitted at trial. A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was involuntary is reviewed *de novo. Hannon v. State*, 2004 WY 8, ¶ 12, 84 P.3d 320, 328 (Wyo. 2004). In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. *Id.* When the defendant claims that his statements were involuntary, "it is the duty of an appellate court . . . 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Id.*, ¶ 50, 84 P.3d at 339 (quoting *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976)).

[¶16] Before evaluating Sen's claim that his statements were involuntary, we set forth the relevant circumstances of his interrogation. At approximately 5:00 p.m. on the day of the shooting, Sen was detained in an interview room at the Sheridan Police Department, where he was interviewed by two DCI agents. At the beginning of the interview, Sen was advised of his Miranda rights verbally and in writing. The interview then continued:

> AGENT: Do you know why you're here, Dhar?
>
> SEN: I think I can guess why.
>
> AGENT: Okay. Why don't you tell us?
>
> SEN: I'm going to – I'm going to stay silent.
>
> AGENT: You're going to stay silent?
>
> SEN: I'm just going to stay silent.
>
> AGENT: So you're invoking your right? Is that what you're saying?

7

SEN: (Inaudible.)

AGENT: Pardon me?

SEN: Invoking means using?

AGENT: Yeah.

SEN: Yeah. Pretty much.

AGENT: Okay.

SEN: I mean – I didn't do it, but, I mean, I'm pretty sure I can figure out where it came from and what happened.

AGENT: You didn't do what?

SEN: I'm very sure that I'm being accused for something that had to do with an incident on Thurmond.

AGENT: Why's that?

SEN: Because the police officer outside told me.

AGENT: Okay.

SEN: Both of them did, and I (inaudible).

AGENT: Okay. Well you've invoked your right to remain silent. If you change your mind, you can get a hold of one of us.

Immediately following this exchange, the agent informed Sen that he was going to apply a gunshot residue test to Sen's face and hands. Before administering the test, however, the agent asked Sen approximately 15 questions regarding his family, his school, his contact information, and who he was with when he was arrested. After the gunshot residue test was administered, Sen was left alone in the interview room. During his detention, Sen was offered food and drinks, and was allowed to go to the bathroom.

[¶17] Approximately three hours later, at 8:20 p.m., Sen knocked on the window of the interview room and indicated that he wanted to talk to the agents. The agents returned and, before questioning Sen, they noted that he had previously invoked his right to remain silent and again advised him of his Miranda rights verbally and in writing. Sen

8

stated that he understood his rights and signed a written advisement of rights. He then asked the agents whether they thought he should have an attorney present. The agents responded that they could not provide legal advice, and Sen proceeded with the interview without requesting an attorney. During the second interview, Sen admitted to breaking into the Ernsts' home with Poitra and Bear Cloud and to shooting Mr. Ernst.

[¶18] Sen contends that his confession was involuntary because it was the combined product of his immaturity and improper interrogation tactics employed by the DCI agents. Specifically, he notes the length of his detention, the "cavalier" manner in which the agents advised him of his rights, and the agents' failure to honor his right to remain silent as factors indicating that his statements were not voluntary. Additionally, although he does not claim that he invoked his right to an attorney, Sen asserts that the same factors prevented him from knowingly and intelligently waiving his right to counsel.

[¶19] The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. *Hannon*, ¶ 12, 84 P.3d at 328. In determining whether a confession obtained during custodial interrogation is voluntary, we look to the totality of the circumstances surrounding the interrogation. *Id.*, ¶ 51, 84 P.3d at 340.

> Among the circumstances considered are the atmosphere and events surrounding the interrogation, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time. [*State v.*] *Evans*, 944 P.2d [1120,] 1125 [(Wyo. 1997)]. Other relevant factors include:
>
> > [w]hether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law

enforcement and the criminal justice system.

*Id.* "A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion, or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary." *Wilkins v. State*, 2005 WY 2, ¶ 9, 104 P.3d 85, 89 (Wyo. 2005).

[¶20] With regard to statements made by juveniles during custodial interrogations, we have recognized that "the greatest care must be exercised to assure that the giving of a statement by a juvenile was in fact voluntary and not the product of immaturity, ignorance or coercion." *Jahnke v. State*, 692 P.2d 911, 923 (Wyo. 1984). Nonetheless, in *Jahnke*, we also stated that "the fact that the individual being questioned is a juvenile is simply a factor to be considered in the totality of the circumstances in order to determine whether the waiver [of constitutional rights] was efficacious." *Id.* We noted that this approach is consistent with the United States Supreme Court's decision in *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, *reh. denied* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979), which held that

> This totality-of-the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits – indeed, it mandates – inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

In accordance with this approach, in *Rubio*, 939 P.2d at 242, we held that a 15-year-old's immaturity did not preclude a knowing and voluntary relinquishment of his rights.

[¶21] Although Sen was only 15 years old at the time of his interrogation, the totality of the circumstances in this case indicates that Sen's decision to waive his rights was the result of a free and deliberate choice. First, we note that the record reflects that Sen had extensive experience with the criminal justice system. As noted above, Sen's prior record included violations for hit and run, flight to avoid arrest, shoplifting, unauthorized use of a motor vehicle, disorderly conduct, and disturbing the peace. During his interrogation, Sen acknowledged that he had previously been advised of his Miranda rights as a result of these offenses. Additionally, Sen's statement that he was "going to

stay silent" indicates that he understood the nature of his rights and the consequences of waiving those rights.

[¶22] Further, we find that the circumstances of Sen's interrogation were not improperly coercive. As we noted in *Hannon*, ¶ 59, 84 P.3d at 342, in evaluating the interrogation tactics of law enforcement, we must balance two competing interests:

> [F]irst, society's interest in preserving the dignity of the individual and of society and preventing the risk of unreliable confessions by preventing the government from employing tactics that coerce confessions; and second, society's interest in allowing the government to use permissible tactics that may motivate a suspect to confess of his own free will.

In this case, there is no indication in the record that the agents made threats or promises to induce Sen's confession, or that there were any deficits in Sen's physical or mental condition at the time of the interrogation. During the time that Sen was detained, he was offered food and drinks, and was allowed to go to the bathroom. Further, we are not persuaded that the length of Sen's detention was improper in light of the circumstances. The legitimacy of this tactic is supported by our decision in *Bhutto v. State*, 2005 WY 78, ¶ 18, 114 P.3d 1252, 1262 (Wyo. 2005), where we held that confinement to an interview room for "the better part of [a] day," when such detention serves the legitimate purposes of a murder investigation, cannot be characterized as coercive.

[¶23] Sen asserts that the agents' questioning after he invoked his right to remain silent in the first interview was improper. Immediately after invoking that right, however, Sen told the agents, "I didn't do it." As noted in *Bui v. DiPaolo*, 170 F.3d 232, 240 (1st Cir. 1999) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981)), courts routinely conclude that a defendant who has professed an understanding of his right to remain silent "will be held to have effected a waiver when, after receiving warnings and asserting (equivocally or unequivocally) a right to remain silent, he spontaneously recommences the dialogue with his interviewers." Because Sen recommenced dialogue with the agents, subsequent questioning by the agents during the interview was not improper. In sum, we find no grounds to conclude that Sen's confession was the product of coercion. Based on the totality of the circumstances, we find that Sen effected a valid waiver of his Miranda rights, and his subsequent confession to the crimes was voluntary.

## III. Motion to Suppress Results of Test for Gunshot Residue

[¶24] Sen also claims the trial court erred in denying his motion to suppress evidence obtained from the gunshot residue test administered during his custodial interrogation. He contends the test was an unlawful warrantless search and suggests, as a reasonable alternative, that his hands could have been bagged or handcuffed to preserve any gunshot

11

residue while law enforcement procured a warrant. Sen, however, does not provide any authority indicating that a superficial search for gunshot residue violates protections against unreasonable searches or seizures.

[¶25] We apply the same standard of review as to the denial of Sen's motion to suppress his confession. We defer to the district court's factual findings unless they are clearly erroneous and view the evidence in the light most favorable to the district court's determination. We review the ultimate determination regarding the constitutionality of a particular search or seizure *de novo*. *Owens v. State*, 2012 WY 14, ¶ 8, 269 P.3d 1093, 1095 (Wyo. 2012).

[¶26] The Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution protect individuals from unreasonable searches and seizures. Warrantless searches and seizures are presumptively unreasonable unless they are justified by probable cause and an established exception to the warrant requirement. *Owens*, ¶ 10, 269 P.3d at 1096. "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [United States Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 949, 148 L.Ed.2d 838 (2001)). Among the recognized exceptions to the warrant requirement are searches incident to arrest and searches and/or seizures to prevent the imminent destruction of evidence. *Pena v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004).

[¶27] During the suppression hearing, the DCI agent who administered the test explained that evidence of gunshot residue was obtained by swabbing a two-inch applicator on Sen's hands and face. He stated that the residue is usually invisible to the naked eye, and that it can be wiped or rubbed away on surfaces contacting the skin. In light of the evanescent nature of gunshot residue, many courts have held that a warrantless search for such evidence does not violate constitutional protections against unreasonable searches. For example, in *United States v. Johnson*, 445 F.3d 793, 795-96 (5th Cir. 2006), the court stated that "Because the presence of gun powder on his hands was relevant evidence that Johnson (or merely time) could have eventually removed or destroyed, if his arrest was valid, the performance of the gun powder residue test was lawful, and the admission of the results at trial was proper." After finding that the defendant's arrest was lawful, the court concluded that the gunpowder residue test was a lawful warrantless search incident to his arrest. *Id.*, 445 F.3d at 796. Similarly, in *State v. Riley*, 201 W. Va. 708, 717 (W. Va. 1997), West Virginia's highest court determined that the admission of evidence obtained from a swab of the defendant's face and hands for gunpowder residue was "consistent with the general recognition that superficial examination of a lawfully arrested individual for evidence of gunpowder residue is not violative of the Fourth Amendment prohibition against unreasonable searches and seizures." *See also Lawler v. State*, 276 Ga. 229, 234 (Ga. 2003) ("The search of Lawler at the police station was a lawful search incident to his arrest. Swabbing for blood or

gunshot residue at that time was not an unconstitutional search.") (citation omitted).

[¶28] Sen does not contend that his arrest was unlawful. Rather, he contends that, because 16 hours had passed between the shooting and his arrest, "[t]he danger of the trace evidence wiping off [his] hands had already passed." However, the validity of this argument is belied by the fact that gunshot residue was, in fact, found on Sen 16 hours after his arrest. Additionally, we are not persuaded that justification for the search was eliminated by the mere possibility that the evidence had already been destroyed. Consistent with the conclusions reached in cases set forth above, we find that, in light of the minimal intrusion caused by the swab for gunshot residue and the easy destructibility of such evidence, administration of the gunshot residue test was a valid search incident to arrest. The district court did not err in denying Sen's motion to suppress the gunshot residue evidence.

## IV. Admissibility of Testimony Relating to Sen's Capacity to Form Criminal Intent

[¶29] In his next issue, Sen claims that the district court's decision to exclude expert testimony of Dr. Marie Banich violated his right to present a defense under the Compulsory Process Clauses of the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution. A violation of the Compulsory Process Clause occurs when a defendant is arbitrarily deprived of testimony that would have been relevant, material, and vital to his defense. *Dysthe v. State*, 2003 WY 20, ¶ 5, 63 P.3d 875, 879 (Wyo. 2003). The mere invocation of the right to compulsory process, however, "cannot automatically and invariably outweigh countervailing public interests." *Id.*

> The factors to be weighed in the balance include, but are not limited to the "integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process."

*Id.*, quoting *Taylor v. Illinois*, 484 U.S. 400, 414-15, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988). In accordance with these principles, courts have recognized that "'the right to present defense witnesses is not absolute. A defendant must abide the rules of evidence and procedure,' including 'standards of relevance and materiality.'" *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005) (quoting *United States v. Bautista*, 145 F.3d 1140, 1151-52 (10th Cir. 1998)).

[¶30] We review a trial court's decision to admit or reject expert testimony for an abuse of discretion. *Gruwell v. State*, 2011 WY 67, ¶ 12, 254 P.3d 223, 227 (Wyo. 2011). Under an abuse of discretion standard, "the ultimate issue is whether or not the court

could reasonably conclude as it did." *Breazeale v. State*, 2011 WY 10, ¶ 30, 245 P.3d 834, 843 (Wyo. 2011) (quoting *Lawson v. State*, 994 P.2d 943, 947 (Wyo. 2000)). "Decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal." *Lawson*, 994 P.2d at 947.

[¶31] As noted above, prior to trial, the State filed a motion in limine to exclude Dr. Banich's testimony on the grounds that it related to the defense of "diminished capacity." The court deferred ruling on the motion until the defense could provide more information regarding the proposed testimony. The court addressed the matter again at trial when it requested an offer of proof from the defense regarding Dr. Banich's proposed testimony. During the offer of proof, defense counsel asked Dr. Banich to explain the "workings of a normal 15-year-old brain." Dr. Banich testified that, based on the results of a large-scale study of decision-making abilities of individuals aged 10 to 30, 15-year-olds, when compared to adults, reported greater impulsiveness, evaluated risks and rewards differently, and had less sensitivity to punishment. Sen claimed that this testimony was relevant, material, and vital to his defense. After considering the offer of proof and counsel's arguments, the district court determined that Dr. Banich's testimony was inadmissible because her testimony related to the defense of diminished capacity, a defense that is not recognized in Wyoming. As a result, the court found that the testimony was not relevant under W.R.E. 401.[2]

[¶32] Sen asserts that Dr. Banich's testimony was offered to help the jury understand "the workings of an average fifteen-year-old's mind." He insists that the district court erred in excluding Dr. Banich's testimony on the grounds that it constituted a defense of diminished capacity because, according to Sen, the testimony would have shown instead that he "had all the capacity of an average fifteen-year-old," but that "an average fifteen-year-old's brain is not capable of engaging in the mental calculus required to form specific intent." He contends that, "Without proving this specific intent element, it would not have been possible to convict [Sen] of aggravated burglary, let alone felony murder."

[¶33] We are unable to find any merit in Sen's claim that the district court erred in rejecting Dr. Banich's testimony because (1) there is no support in the record for the assertion that Dr. Banich would have testified that 15-year-olds do not have the capacity to form specific intent, and (2) Sen has failed to provide any legal authority supporting his claim that the proposed testimony was relevant. First, we must point out that Dr. Banich's proposed testimony does not support Sen's contention that a 15-year-old does not have the capacity to form criminal intent. In response to defense counsel's

---

[2] W.R.E. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

14

questioning during the offer of proof, Dr. Banich testified as follows:

> DEFENSE COUNSEL: [15-year-olds] are capable of planning; are they not?
>
> DR. BANICH: Yes.
>
> DEFENSE COUNSEL: They are capable of matching intent with volition, of acting on that intent?
>
> DR. BANICH: I'm not sure we looked at that directly, so it depends on what you mean by that.
>
> DEFENSE COUNSEL: But when you say that they are capable of planning, as I understand it, the difference that you found – by planning I mean: "Okay, I want to go out and I want to look for property that's valuable to steal, and so I go out, walking the streets late at night looking for cars that might be unlocked"; that would be intent and planning. I'm assuming that they're capable of doing that?
>
> DR. BANICH: Yes.
>
> DEFENSE COUNSEL: And the difference [between adults and 15-year-olds] is that the way in which [a 15-year-old] may try to execute it may be more circuitous or may not take into consideration the types of things that an adult would do?
>
> DR. BANICH: Right, or the potential consequences of that, yes.
>
> DEFENSE COUNSEL: Thank you. I have no further questions.

As indicated in this excerpt from the trial transcript, Dr. Banich's proposed testimony did not indicate that 15-year-olds are incapable of *intending* to perform a criminal act or producing the desired result of that act. Rather, her proposed testimony suggested that 15-year-olds, when compared to adults, are more impulsive and have a reduced ability to evaluate the consequences of their actions. The fact that a juvenile may not appreciate the consequences of his or her actions as fully as an adult, however, does not suggest that a juvenile does not have the capacity to form "specific intent."

[¶34] In addition to the fact that the record contains no evidentiary support for his argument, Sen's brief presents no legal authority from Wyoming or other jurisdictions

15

addressing incapacity to form specific intent based on the defendant's age. He contends that Dr. Banich's proposed testimony did not relate to the defense of diminished capacity, but he does not provide any authority supporting its admissibility if the testimony was not presented in relation to a diminished capacity defense. To the extent that the proposed testimony could be viewed as evidence of diminished capacity, we are not inclined to expand the defense of mental incapacity beyond the scope of Wyo. Stat. Ann. § 7-11-302.[3] *See Dean v. State*, 668 P.2d 639, 644 (Wyo. 1983) ("If the legislature had intended additional defenses, it would have said so. Courts will not enlarge, stretch, expand or extend a statute to matters not falling within its express provisions, and they will not usurp the powers of the legislature by deciding what should have been said."). Although Sen has not addressed the issue, we note that his characterization of Dr. Banich's testimony could relate to the common law defense of infancy. However, as explained below, in the context of a criminal proceeding, the defense of infancy has been supplanted by our legislature's allocation of jurisdiction between juvenile and criminal courts.

[¶35] Under common law, the infancy defense is available only to children under the age of fourteen. Children under the age of seven are conclusively presumed to be without criminal capacity. For those between the ages of seven and fourteen, there is a rebuttable presumption of criminal incapacity. 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.6 (2d ed. 2003). A juvenile who has reached the age of fourteen, however, is fully accountable for his criminal actions unless incapacity is established on some other basis such as insanity. *Id.*; *see also In re Devon T.*, 584 A.2d 1287, 1290 (Md. Ct. Spec. App. 1991).

[¶36] Wyoming case law has not recognized the common law infancy presumptions. Rather, our legislature has developed a system in which defendants tried in juvenile court are afforded greater protections than those granted to adults in the criminal justice

---

[3] Wyo. Stat. Ann. § 7-11-302 provides as follows:

    (a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity, to:

        (i) Comprehend his position;

        (ii) Understand the nature and object of the proceedings against him;

        (iii) Conduct his defense in a rational manner; and

        (iv) Cooperate with his counsel to the end that any available defense may be interposed.

system. Under Wyo. Stat. Ann. § 14-6-203(d), the juvenile courts have exclusive jurisdiction in cases "in which a minor who has not attained the age of thirteen (13) years is alleged to have committed a felony or a misdemeanor punishable by imprisonment for more than six (6) months." In all other cases in which a minor is alleged to have committed a criminal offense, the juvenile court has concurrent jurisdiction with the district court. Wyo. Stat. Ann. § 14-6-203(c). When the decision has been made to try a juvenile in criminal court, he is subject to the same legal rules that apply to adult criminal defendants in his position. *Bear Cloud I*, ¶ 86, 275 P.3d at 412 ("Once a juvenile's case is vested in the criminal courts, the public policies affording a juvenile different treatment than adults are no longer applicable."). In light of the statutory mechanisms affording different treatment to defendants tried in juvenile court, as opposed to criminal court, a defense of incapacity based on the defendant's age has no application in a criminal proceeding. As a result, we agree with the district court that Dr. Banich's testimony was not relevant. Accordingly, we find no abuse of discretion in the district court's decision to exclude Dr. Banich's testimony.

## V.  Ineffective Assistance of Counsel

[¶37] Sen also seeks reversal of his convictions based on a claim that he received ineffective assistance of counsel. After filing his appeal, Sen filed a motion for limited remand for the purpose of developing the record on his claim of ineffective assistance of counsel pursuant to W.R.A.P. 21 and *Calene v. State*, 846 P.2d 679 (Wyo. 1993). After a review of the motion, and the attached materials, we denied the motion. In his brief, Sen reasserts his claim of ineffective assistance of counsel based on the same grounds set forth in his motion. His primary contention is that his counsel was ineffective because he failed to interview members of Sen's extended family who would have revealed a familial history of mental illness. He asserts that "Thorough investigation of [Sen's] family history and his not-quite-sixteen years of life experiences was necessary for counsel to provide meaningful representation at the plea negotiations stage, at the transfer hearing, at trial, and at sentencing."

[¶38] In reviewing claims of ineffective assistance of counsel, our paramount consideration is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Gleason v. State*, 2002 WY 161, ¶ 44, 57 P.3d 332, 346-47 (Wyo. 2002). In order to prevail on a claim of ineffective assistance of counsel, Sen must show, first, that trial counsel's performance was deficient, and second, that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*, 466 U.S. at 686, 104 S.Ct. at 2064. We invoke a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. *Rodriguez v. State*, 2010 WY 170, ¶ 14, 245 P.3d 818, 823 (Wyo. 2010). "We are reluctant to reverse

based upon allegations of ineffective assistance of counsel, and have stated that '[i]n the usual case, ineffective assistance of counsel is going to be demonstrable because of a cumulation of errors with a determination that, in the entire context of the trial, the defendant either was, or was not, denied a right to a fair trial.'" *Proffit v. State*, 2008 WY 114, ¶ 33, 193 P.3d 228, 241 (Wyo. 2008) (quoting *Dickeson v. State*, 843 P.2d 606, 612 (Wyo. 1992)).

[¶39] We will limit our analysis of this issue to the prejudice component of the *Strickland* test. *Floyd v. State*, 2006 WY 135, ¶ 13, 144 P.3d 1233, 1238 (Wyo. 2006); *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). In light of our determination that Sen is entitled to a new sentencing hearing, his claim of ineffective assistance of counsel with respect to that stage of the proceedings is moot. With regard to the remaining stages of trial, Sen's claim that his counsel's performance resulted in prejudice consists of the bare allegation that "a more reasonable[,] extensive[,] and thorough investigation . . . would have revealed information which could have changed the outcome of at least some part of these proceedings."

[¶40] Sen's trial counsel requested mental evaluations of Sen on three separate occasions: once in support of his motion to transfer the case to juvenile court, and twice to determine whether he was competent to stand trial. In the first evaluation, the defense's expert psychologist interviewed Sen, the great-aunt and uncle who served as his guardians, another great-aunt, Sen's mother, and Sen's aunt. With regard to Sen's mental status, the psychologist concluded that "There were no overt indications of a thought disorder nor did he display any delusional thinking or unusual beliefs." Similarly, in the forensic evaluations conducted to determine Sen's competency to stand trial, a forensic psychologist from the State Hospital interviewed Sen, his mother, his great-aunt, and two of Sen's peers. On both occasions, the psychologist determined that Sen met the criteria for diagnoses of depressive, anxiety, and conduct disorders, but concluded that there was "no demonstrable link between his mental health problems and his capacity to appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law," and that Sen "was not suffering from a major mental illness that would meet statutory threshold criteria necessary for establishing a basis for the defense, Not Guilty By Reason of Mental Illness or Deficiency."

[¶41] On appeal, Sen identifies a number of extended family members that would have testified to a history of familial dysfunction and mental illness. However, he does not explain how this evidence was relevant to his defense absent an indication that Sen himself suffered from a mental illness that would affect his culpability under Wyoming law. He fails to compare the statements of his extended family members with the evidence contained in the record, and he does not attempt to demonstrate how such

testimony would have impacted the results of his mental evaluations, altered the prosecutor's charging decision, impacted plea negotiations, or persuaded the district court to transfer the case to juvenile court. Because of these deficiencies in Sen's claim, we are unable to find any prejudice to the defense. Sen has failed to establish that his counsel was ineffective.

## VI. Sentencing

[¶42] Sen was sentenced to life imprisonment without the possibility of parole for the crime of first-degree felony murder. He was fifteen years old when he committed the crime. He contends that his sentence violated the Eighth Amendment to the United States Constitution because the sentencing court was required by statute to impose a sentence of life without the possibility of parole. We recently determined that the statutory sentencing scheme under which Sen was sentenced was unconstitutional. *Bear Cloud II*, 2013 WY 18, 294 P.3d 36. We must now decide whether Sen is entitled to a new sentencing hearing to satisfy the constitutional requirements established by the United States Supreme Court in *Miller v. Alabama* and recognized by this Court in *Bear Cloud II*.

[¶43] The Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." As the Supreme Court explained in *Miller*, 132 S.Ct. at 2463:

> The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper* [*v. Simmons*], 543 U.S. [551,] 560, 125 S.Ct. 1183, [1190,] 161 L.Ed.2d 1 [(2005)]. That right, we have explained, "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. *Ibid.* (quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, [549,] 54 L.Ed. 793 (1910)). As we noted the last time we considered life-without-parole sentences imposed on juveniles, "[t]he concept of proportionality is central to the Eighth Amendment." *Graham* [*v. Florida*], 560 U.S. [ ___ ], ___, 130 S.Ct. 2011, [2021,] 176 L.Ed.2d 825 [(2010)]. And we view that concept less through a historical prism than according to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, [290,] 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, [598,] 2 L.Ed.2d 630 (1958) (plurality opinion)).

The issue of whether a sentence violates the Eighth Amendment's prohibition against

cruel and unusual punishment receives *de novo* review. *Bear Cloud I*, ¶ 46, 275 P.3d at 395.

[¶44] Sen was sentenced to "life imprisonment without parole" pursuant to Wyo. Stat. Ann. § 6-2-101(b) (LexisNexis 2009). That statute provides as follows:

> **§ 6-2-101. Murder in the first degree; penalty.**
>
> (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, sexual abuse of a minor, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.
>
> (b) A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of eighteen (18) years.

Under Wyo. Stat. Ann. § 6-10-301(c) and Wyo. Stat. Ann. § 7-13-402(a), a person sentenced to "life imprisonment without parole" or "life imprisonment according to law" is not eligible for parole:

> **§ 6-10-301. Life imprisonment without parole.**
>
> . . .
>
> (b) A person sentenced to life imprisonment without parole shall not be eligible for parole and shall remain imprisoned under the jurisdiction of the department of corrections during the remainder of his life unless pardoned by the governor.
>
> (c) A sentence specifically designated as a sentence of life imprisonment without parole is not subject to commutation by the governor. A sentence of life or life imprisonment which is not specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor. A person sentenced to life or life imprisonment is not eligible for parole unless the governor has commuted the person's sentence to a term of years.
>
> **§ 7-13-402. General powers and duties of board;**

20

**eligibility for parole; immunity.**

> (a) The board may grant a parole to any person imprisoned in any institution under sentence, except a sentence of life imprisonment without parole or a life sentence, ordered by any district court of this state, provided the person has served the minimum term pronounced by the trial court less good time, if any, granted under rules promulgated pursuant to W.S. 7-13-420.

[¶45]  As noted above, we recently examined the constitutionality of Wyoming's sentencing statutes as applied to juveniles convicted of first-degree murder in *Bear Cloud I* and *Bear Cloud II.*  In *Bear Cloud I*, ¶ 87, 275 P.3d at 413, this Court held that a sentence of "life imprisonment according to law" imposed on a juvenile convicted of first-degree felony murder did not violate the Wyoming or United States Constitutions. Bear Cloud sought review of that decision in the United States Supreme Court.  The Supreme Court summarily vacated the judgment in *Bear Cloud I* and remanded the case for further consideration in light of *Miller v. Alabama*, which was issued after our decision in *Bear Cloud I. Bear Cloud v. Wyoming*, ___ U.S. ___ , 133 S.Ct. 183, 184 L.Ed.2d 5 (2012) (mem.).

[¶46]  In our decision following remand, we set forth the relevant United States Supreme Court precedent, beginning with the decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.E.2d 637 (1983), which held that commutation of a sentence does not equate to the possibility of parole, and culminating in *Miller*'s holding that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments.  *Bear Cloud II*, ¶¶ 19-28, 294 P.3d at 41-44.  We then proceeded to determine that the combined operation of Wyo. Stat. Ann. § 6-2-101(b), Wyo. Stat. Ann. § 6-10-301(c), and Wyo. Stat. Ann. § 7-13-402(a), which allow for the possibility of parole only upon commutation of a sentence of "life according to law," conflict with Supreme Court precedent because they exclude any meaningful possibility of parole for juveniles convicted of first-degree murder.  *Bear Cloud II*, ¶¶ 33-34, 294 P.3d at 45.

[¶47]  After determining that the phrase "life according to law" must incorporate the Supreme Court's holding in *Miller*, we concluded that compliance with the Supreme Court's Eighth Amendment jurisprudence was achieved by holding Wyo. Stat. Ann. § 6-10-301(c) and Wyo. Stat. Ann. § 7-13-402(a) unconstitutional as applied to juveniles:

> We find this statutory interpretation most appropriate for two reasons. First, it minimizes our intrusion into any legislative function while allowing trial courts to impose the existing possible statutory sentences for first-degree murder in a constitutionally permissible way. Second, it separates

"life imprisonment without parole" from "life imprisonment according to law," making them truly discrete, individual punishments when applied to juveniles.

Accordingly, we hold that Wyoming Statutes §§ 6-10-301(c) and 7-13-402(a) are unconstitutional as applied to juveniles who have been sentenced to life imprisonment according to law under Wyoming Statute § 6-2-101(b). As noted above, these statutes prevent a juvenile who has been sentenced to life imprisonment for first-degree murder from having a meaningful opportunity for parole in violation of the Eighth Amendment. These statutes also fail to provide a sentencing court the discretion to determine whether a juvenile homicide offender should be eligible for parole at some point in the future, as United States Supreme Court case law requires.

*Bear Cloud II*, ¶¶ 37-38, 294 P.3d at 46.

[¶48] Finally, we explained that, in order to fulfill the requirements of *Miller*, a trial court must consider "the factors of youth and the nature of the homicide at an individualized sentencing hearing when determining whether to sentence the juvenile offender to life without the possibility of parole or to life according to law." *Bear Cloud II*, ¶ 42, 294 P.3d at 47.

While not exhaustive, the *Miller* Court specifically indicated some factors for a trial court to consider at sentencing include:

(a) "the character and record of the individual offender [and] the circumstances of the offense," *Miller*, 567 U.S. at ___ , 132 S.Ct. at 2467 (quotation marks omitted);

(b) "the background and mental and emotional development of a youthful defendant," *id.*;

(c) a juvenile's "chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate the risks and consequences," *id.*, 567 U.S. at ___ , 132 S.Ct. at 2468;

(d) "the family and home environment that surrounds" the juvenile, "no matter how brutal or

22

dysfunctional," *id.*;

(e) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure[s] may have affected" the juvenile, *id.*;

(f) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," e.g., the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney, *id.*; and

(g) the juvenile's potential for rehabilitation, *id.*

The United States Supreme Court also explained that the trial court must consider these factors at the time of sentencing in determining the juvenile offender's eligibility for parole. *Id.*, 567 U.S. at _____ , 132 S.Ct. at 2474-75. Examining these factors at the beginning of the case in determining whether to try a juvenile as an adult, i.e., pursuant to a motion to transfer to juvenile court, is not sufficient to meet *Miller*'s requirements. *Id.*, 567 U.S. at ___ , 132 S.Ct. at 2475 ("the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court – and so cannot satisfy the Eighth Amendment").

In sum, *Miller* requires an individualized sentencing hearing for every juvenile convicted of first-degree murder at which the sentencing court must consider the individual, the factors of youth, and the nature of the homicide in determining whether to order a sentence that includes the possibility of parole. *Miller* does not guarantee the possibility of parole for a convicted juvenile homicide offender, but *Miller* does mandate that a meaningful review and consideration be afforded by the sentencing court.

To conform to recent United States Supreme Court jurisprudence, when a Wyoming district court sentences a juvenile convicted of first-degree murder, the sentencing court shall hold an individualized sentencing hearing that conforms to the dictates of *Miller*. The potential sentences authorized by both the Wyoming Legislature and the United

23

States Supreme Court are "life imprisonment without parole" or "life imprisonment according to law." Wyo. Stat. Ann. § 6-2-101(b); *Miller*, 567 U.S. at ___ , 132 S.Ct. at 2469 (refusing to categorically bar a sentence of life without parole for juvenile homicide offenders).

If at the individualized sentencing hearing the trial court determines the juvenile offender should not be foreclosed from the potential for parole in the future, the appropriate sentence will be life imprisonment according to law. In order to conform to *Solem*, *Graham*, and *Miller*, however, the juvenile offender not deprived of the possibility of parole at sentencing must be afforded some meaningful opportunity for release beyond executive clemency. Therefore, the opportunity for true parole at some point in time (as opposed to executive clemency) must be afforded to every juvenile sentenced to "life imprisonment according to law."

To achieve such meaningful opportunity for release, and because the current statutory scheme provides no other method by which to determine parole eligibility, we hold that when a trial court imposes a sentence of life imprisonment according to law upon a juvenile homicide offender, the trial court must also pronounce a specific period of time which must pass before the juvenile becomes parole eligible. We do not here suggest a minimum period of time. That should be determined by the sentencing court after consideration of the individual factors discussed above. After the specified period of time expires, the juvenile offender shall become eligible for parole review before the state board of parole. The trial court should consider the criteria set out above and discussed in *Miller* when determining how long a juvenile offender must wait before becoming eligible for parole review. *Miller* necessitates the sentencing court exercise discretion in determining whether a juvenile homicide offender should receive the future possibility of parole.

*Bear Cloud II*, ¶¶ 42-47, 294 P.3d at 47-48.[4]  Consistent with our decision in *Bear Cloud*

---

[4] Our legislature recently enacted amendments to Wyo. Stat. Ann. § 6-2-101(b) and Wyo. Stat. Ann. § 6-10-301(c) that eliminate life sentences without parole for juvenile offenders effective July 1, 2013.  The

*II*, we find that Sen's sentence was imposed pursuant to a statutory sentencing scheme that was unconstitutional as applied to juveniles because it effectively mandated a sentence of life in prison without the possibility of parole for juveniles convicted of first-degree murder.

[¶49]  In light of *Miller*, the State concedes that Wyoming's sentencing statutes imposed mandatory life without parole for juveniles convicted of first-degree murder.  However, the State notes that a sentence of life without the possibility of parole for a juvenile convicted of first-degree murder remains a constitutionally permissible sentence under *Miller*.  Further, the State claims that "Sen's sentencing hearing met the requirements of *Miller* because the State and [Sen] presented evidence that spoke directly to the issues of [Sen's] youth."  As a result, the State suggests that we need not remand to the district court for resentencing.  Ultimately, however, the State requests that this Court either

> 1) Affirm [Sen's] sentence as consistent with the holdings of the United States Supreme Court in *Miller*; or 2) Remand the case for a new sentencing hearing with instructions to the district court that life according to law and life without parole are two different sentences, and that it should consider

---

amended statutes provide as follows:

**6-2-101. Murder in the first degree; penalty.**

(b) A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that a person convicted of murder in the first degree who was under the age of eighteen (18) years at the time of the offense shall be punished by life imprisonment.

**6-10-301. Life imprisonment without parole; life imprisonment.**

(c)  Any sentence other than a sentence specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor.  A person sentenced to life imprisonment for an offense committed after the person reached the age of eighteen (18) years is not eligible for parole unless the governor has commuted the person's sentence to a term of years.  A person sentenced to life imprisonment for an offense committed before the person reached the age of eighteen (18) years shall be eligible for parole after commutation of his sentence to a term of years or  after having served twenty-five (25) years of his sentence, except that if the person committed any of the acts specified in W.S. 7-13-402(b) after having reached the age of eighteen (18) years the person shall not be eligible for parole.

2013 House Bill No. 23, *available at* http://legisweb.state.wy.us/2013/Introduced/HB0023.pdf.

[Sen's] age and all of its characteristics before imposing [a new] sentence.

We do not agree with the suggestion that affirming Sen's sentence is a viable option or that Sen's sentencing hearing met the requirements of *Miller*.

[¶50] Sen is entitled to a sentencing decision that is informed by the Supreme Court's holding in *Miller* and its discussion of the distinctive characteristics of youth. While a sentence of life without parole for a juvenile convicted of first-degree murder remains a constitutionally permissible sentence under *Miller*, the Supreme Court stated that such sentences should be uncommon in light of the significant differences between juveniles and adults:

> We [] hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. *Cf. Graham*, 560 U.S., at ___, 130 S.Ct. 2011, 176 L.Ed.2d 825 ("A State is not required to guarantee eventual freedom," but must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham* and this decision about children's diminished culpability and heightened capacity for change, ***we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon***. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and ***the rare juvenile offender whose crime reflects irreparable corruption***." *Roper*, 543 U.S., at 573, 125 S.Ct. 1183, 161 L.Ed.2d 1; *Graham*, 560 U.S., at __, 130 S.Ct. 2011, 176 L.Ed.2d 825. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Miller*, ___ U.S. at ___ , 132 S.Ct. at 2469 (emphasis added). In reaching this conclusion,

26

the Court explained at length the reasons that juveniles are "less deserving of the most severe punishments," referencing *Roper* and *Graham*, as well as precedent demanding individualized sentencing when imposing the death penalty. *See Miller*, ___ U.S. at ___, 132 S. Ct. at 2463-2468. Based on the collective teachings of these decisions, the Court concluded that juveniles have lessened criminal culpability as compared to adults, that they have greater prospects for reform, and that the mental traits and environmental vulnerabilities of juveniles are not crime-specific. *Id.* The Court summarized the inherent defects of a mandatory life without parole sentencing scheme as follows:

> Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other – the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses – but really, as *Graham* noted, a *greater* sentence than those adults will serve. In meting out the death penalty, the elision of all these differences would be strictly forbidden. And once again, *Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.

> So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. *See, e.g., Graham*, 560 U.S., at ___, 130 S.Ct.

27

2011, 176 L.Ed.2d 825 ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J. D. B. v. North Carolina*, 564 U.S. ___, ___, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, ___ U.S. at ___, 132 S.Ct. at 2467-68 (footnote omitted; emphasis in original).

[¶51] In light of the significant development in Eighth Amendment jurisprudence represented by the Supreme Court's decision in *Miller v. Alabama*, Sen is entitled to a new sentencing hearing which takes into account the distinguishing characteristics of youth, as collected and articulated in that decision. Considering the serious nature of Sen's crime and the fact that life without parole is the most severe punishment available for a juvenile, every effort should be made on remand to ensure that the court receives all information relevant to a determination of Sen's eligibility for parole. Further, in exercising its discretion with regard to a determination as to parole eligibility, the district court must set forth specific findings supporting a distinction between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." As we noted in *Daniel v. State*,

"The benefits of requiring the trial court to state its reasons for the imposition of its sentence are manifold: First, requiring the trial court to articulate its reasons for selecting a sentence will promote more thoughtful consideration of relevant factors and will help rationalize the sentencing process. . . . Requiring a trial court to provide a reasoned basis for the sentence imposed may enhance the court's legitimacy as perceived by judges themselves and participants in the criminal justice system. It will aid courts in attaining their institutional objective of dispensing equal and impartial justice and will demonstrate to society that these goals are being met. . . . Finally, a statement of reasons will be invaluable in aiding appellate courts to ascertain whether the sentence imposed was based upon accurate, sufficient and proper information."

644 P.2d 172, 179 (Wyo. 1982) (quoting *Commonwealth v. Riggins*, 474 Pa. 115, 129-31, 377 A.2d 140, 147-48 (1977)). For the foregoing reasons, we vacate Sen's sentence of life without the possibility of parole and remand to the district court for a new sentencing hearing. Further, because Sen's sentence of life without the possibility of parole may have impacted the sentencing decisions with respect to his conspiracy and aggravated

burglary convictions, which resulted in an additional 40 to 50 years imprisonment beyond his life term, we think the appropriate course is to vacate those sentences and remand for resentencing on all counts in order to give full effect to our decision.

## *CONCLUSION*

[¶52] We find no error impacting Sen's convictions and, accordingly, we affirm those convictions. However, Sen's sentence of life without parole was imposed under a sentencing scheme that precluded the possibility of parole. As a result, Sen's sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment and relevant Supreme Court precedent. Accordingly, we vacate Sen's sentence and remand to the district court for resentencing on all counts.