Dale Charles CURL, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 94–100.

Supreme Court of Wyoming.

June 6, 1995.

Leonard Munker, State Public Defender, Gerald M. Gallivan, Director, Defender Aid Program, and Robert A. Bundy, Student Intern., for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., D. Michael Pauling, and Mary Beth Wolff, Senior Asst. Attys. Gen., for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

TAYLOR, Justice.

Dale Curl (Curl) chose four young children to satiate his sexual desires, isolating his prey prior to each attack. The testimony of his youthful victims was pivotal to jury convictions on two counts of taking immoral or

indecent liberties and two counts of second-degree sexual assault. Curl assigns error to the district court's admission of testimony from corroborative witnesses and claims the State failed to prove one sexual assault. Finding no error in the admission of testimony and sufficient direct evidence, we affirm.

## I. ISSUES

Curl states his issues as follows:

### Issue I

The admission of testimony stating that the defendant was guilty of sexual abuse was error per se and plain error and denied appellant of his right to a trial by jury.

### Issue II

The admission of testimony of witnesses vouching for the credibility of [minor victim VD] and [minor victim LS] was error per se and plain error.

### Issue III

The trial court committed reversible error when witnesses testified to prior consistent statements under W.R.E. 801(D)(1)(B) [sic] without regard to the express conditions recognized by this court and contained in the rule requiring such statements be consistent with the declarant's testimony.

### Issue IV

Error was committed when statements admitted under 801(D)(1)(B) [sic] were improperly used to rehabilitate unimpeached witnesses.

### Issue V

The trial court erred in failing to grant appellant's motion for acquittal at the close of the evidence as the state failed to prove all elements of second degree sexual assault.

The State identifies a single issue:

I. Whether the trial court properly allowed admission of all testimony?

## II. FACTS

Curl lived with his wife; his stepson CD, born July 23, 1983; and his daughter, TS, born September 9, 1983. When CD's ten-year-old playmate, VD, told his mother that Curl had taken him off by himself in order to show him men's magazines, VD's mother summoned the police. Investigation raised concerns that Curl had victimized at least four children, ten years of age and under, and interviews with his daughter and her friend and with his stepson and his playmate substantiated those concerns. Two of the children were examined by physicians.

VD told the jury he was at Curl's residence playing video games with Curl's stepson, CD, when Curl enticed VD into an area of the house where the two were alone to show him a men's magazine. CD confirmed his stepfather's efforts to isolate VD, testifying that Curl "took [VD] upstairs and—well, when I was with my sister he yelled back down to clean out the room."

Once Curl had VD alone, he showed the boy a men's magazine and then, in VD's words, "He [Curl] asked me if looking at things like that, did that make my thing ever get hard."

Q. What do you remember happened after that?

[VD]. He put his hand on me, my leg, and he asked me if he could look at it.

Q. Look at your thing?

[VD]. Yeah.

Q. Now, when we're saying "your thing and did it get hard," are we talking about your penis?

[VD]. Yeah.

\* \* \* \* \* \*

Q. What did you say?

[VD]. "No."

Q. What did he say next?

[VD]. He said: "Come on, a little peek, it won't hurt you."

VD testified that Curl's pants were revealing: "Not baggy shorts, but silk shorts that were really tight."

Q. Did it look like his privates were hard, too?

[VD]. Yeah.

Q. Did he ever try to stand behind you?

[VD]. Yeah.

Q. Tell me about that. What did he do?

[VD]. Well, I went downstairs and he put my face up to the wall and he let me down. He said, "I want to see how tall you are." So he was behind me, and finally I scooted out.

Curl was convicted by the jury of taking immoral or indecent liberties with VD.

LS testified that when she was eight years old, she went to spend the night with Curl's daughter, TS. As TS and LS were in the bathroom preparing for bed, LS testified:

[LS]. [TS's] dad came in and he told her to get out.

Q. So did [TS] walk out of the bathroom?

[LS]. Yeah.

Q. So then it was just you and [TS's] dad?

[LS]. Yeah.

Q. What happened then?

[LS]. He touched and kissed me on my private parts.

Q. Okay. Did you have your clothes on when he did that?

[LS]. No.

Q. Did you have your clothes on when he came in the bathroom?

[LS]. Yes.

Q. How did you get your clothes off?

[LS]. He told me to.

\* \* \* \* \* \*

Q. \* \* \* How did you get it to stop?

[LS]. Just that I started crying.

Q. Did he say anything to you?

[LS]. He said for me to keep it a secret.

Curl was convicted by the jury of committing immoral or indecent acts with LS.

Curl's stepson, CD, described a protracted course of sexual abuse by his stepfather starting some two years earlier. CD indicated Curl would fondle and fellate him, de-

manding reciprocation. Curl also attempted to sodomize his stepson, telling the boy in a menacing fashion to keep these things secret.

Dr. Robert Prentice, the physician who examined CD after Curl's arrest, testified that CD had reported a course of events identical to those the boy later described in court, including attempted anal penetration, further asserting that such grim scenes had been reenacted "maybe 15 or 20" times. Dr. Prentice's examination revealed damage that could have occurred with an attempt at anal penetration:

> I was looking for evidence of trauma of the anus since he had alleged anal penetration. And I was surprised in one sense—because usually we don't find much, especially on males on physical exam—to see that there was a scar. With an attempt at anal penetration, the scar could have formed with tearing of the [perineal] tissue.

The jury found Curl to have committed second-degree sexual assault upon his stepson.

Perhaps the most reticent of the youthful witnesses was Curl's daughter, TS. With a good deal of prompting, TS testified that Curl had touched her vaginal area and tried to insert his penis there. As was the case with her stepbrother, these insults had occurred over a period of at least two years, accompanied by a harsh warning: "If you tell mom, I'm going to get you."

Dr. Carol Schiel, the physician who examined TS after Curl's arrest, recounted TS's statement that she was at the doctor's office because her father was putting his penis in her vagina. According to Dr. Schiel, a physical examination of TS revealed an abnormal thickening of the hymenal area, reddening in the area between the vagina and the rectum, and increased tenderness in the rectal area, which "physical findings were consistent with the history that she gave me."

The only evidence adduced by Curl concerned his efforts to portray his daughter as a liar by introducing non-professionally prepared "Burks Behavior Rating Scales" and eliciting testimony that TS would tell falsehoods to avoid submitting school assign-

ments. The record is devoid of evidence which contradicts any material portion of the testimony of Curl's young victims.

The jury found Curl to have committed second-degree sexual assault upon his daughter.

## III. DISCUSSION

### A. OPINION AS TO GUILT

■ Curl asserts that the prosecutor improperly asked for and received Dr. Schiel's opinion, as an expert, as to Curl's guilt in the assault upon his daughter, TS. If such were indeed the case, it would constitute error per se, necessitating reversal of that conviction. *Stephens v. State,* 774 P.2d 60, 64 (Wyo.1989). The obvious rationale for this rule is that it is the jury, themselves, who are the sole experts in the realm of witness credibility. *Saldana v. State,* 846 P.2d 604, 618 (Wyo.1993).

■ Dr. Schiel testified as to the child's narrative of the events necessitating medical examination. TS reported that her father had put his penis into her vagina. Dr. Schiel then described her physical findings and engaged in the following exchange with the prosecutor:

Q. What was your assessment, then, of [TS], looking at these physical findings in relation to her history that you had?

A. The physical findings were consistent with the history that she gave me.

Q. Do you think her stepfather, who she previously identified, did that?

A. In my notes I have father.

Q. Put his private parts on her private parts?

[Defense Counsel]: That's a leading question.

THE COURT: Sustained.

Clearly, the prosecutor laid no foundation upon which to ask Dr. Schiel's opinion on Curl's actions. Had Dr. Schiel responded directly to the prosecutor's artless query, reversal would be required as to Curl's conviction for second-degree sexual assault upon his daughter. Just as clearly, however, Dr. Schiel beneficently interrupted, not to express her opinion as to Curl's actions but to clarify her notes as to whom TS had identified (her father rather than her stepfather).

■ Given proper foundation, a physician may testify as to what a sexual assault victim has reported in the context of examination pursuant to W.R.E. 702. *Betzle v. State,* 847 P.2d 1010, 1022–24 (Wyo.1993); *Goldade v. State,* 674 P.2d 721, 726–27 (Wyo.1983), *cert. denied,* 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984). We hold that Dr. Schiel's testimony was given with proper foundation and did not invade the province of the jury by offering any opinion as to Curl's actions.

### B. VOUCHING FOR CREDIBILITY

■ Curl next complains that VD's mother was permitted, improperly, to vouch for her son's credibility. Curl relies on *McCone v. State,* 866 P.2d 740, 751 (Wyo.1993) for the valid proposition that no "witnesses should be permitted to testify that another witness is or is not telling the truth."

■ Rulings on the admissibility of evidence are committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion. *James v. State,* 888 P.2d 200, 206 (Wyo.1994). Abuse of discretion occurs when a court's decision, or decision-making process, exceeds the bounds of measured reason in light of those matters properly before that court. *Martinez v. State,* 611 P.2d 831, 838 (Wyo.1980).

It was VD's mother who called in law enforcement when her son reported some of Curl's untoward activities. Curl's hearsay objection, at trial, to her testimony concerning what her son had told her was overruled because the statements were offered not for the truth of the matter asserted, but only "to show what prompted the witness, [VD's mother], to call the police."

On cross examination, Curl's counsel chose to set sail on the perilous waters of VD's mother's opinion as to her son's candor. The prosecutor then inquired on re-direct as to VD's mother's observations of her son's demeanor at the time he was telling police what had happened to him. Curl's counsel then

renewed his hearsay objection, but voiced no complaint or objection concerning VD's mother's putative comments on her son's credibility.

 Curl's failure to object to VD's mother's testimony on the basis of impermissible vouching for her son's credibility requires that we analyze that error, unassigned until the appellate stage, in terms of plain error. *Warhawk v. State*, 849 P.2d 1326, 1327 (Wyo.1993). Testimony which helps illuminate some other aspect of the case will not be labeled plain error simply because it has the collateral effect of bolstering the credibility of another witness. *Brown v. State*, 736 P.2d 1110, 1114 (Wyo.1987). VD's mother's challenged testimony is, in fact, strikingly reminiscent of the expert's testimony in *Brown*.

In *Brown*, an expert testified that another witness approached psychological testing in " 'a very truthful fashion, not exaggerating or covering up.' " *Id.* at 1114. Here, VD's mother testified that her son seemed to be talking to the police in a "sincere" manner. While it may have been implicit, VD's mother never testified that she believed her son's version of the events nor did she say her son was telling the truth.

 Like opinions as to guilt, opinions as to the veracity, or lack thereof, of the victim or defendant are fundamentally objectionable if those opinions have the capacity to decide the case *for* the jury. *Bennett v. State*, 794 P.2d 879, 882 (Wyo.1990) (*quoting Stephens*, 774 P.2d at 67). Here, VD's mother testified that her son appeared to be telling the truth to police officers. Although that testimony might have had the collateral or incidental effect of supporting VD's credibility, it was not a direct comment on his credibility or veracity and cannot be said to constitute error. *Saldana*, 846 P.2d at 618.

### C. Prior Statements

Curl assigns error in the admission of testimony pursuant to W.R.E. 801(d)(1)(B), alleging that such testimony was either not consistent with the primary witness's testimony or that it was unaccompanied by the requisite express or implied charge of recent

fabrication. Again, we analyze admissibility questions under the abuse of discretion standard. *James*, 888 P.2d at 206.

Curl's strategy at trial was to question the credibility of his youthful victims. The sum and substance of Curl's defense was that his victims were not worthy of belief and his disingenuous efforts to claim otherwise, on appeal, are tardy and unavailing. *See Eckert v. State*, 680 P.2d 478, 481 (Wyo.1984) and *Allen v. Allen*, 550 P.2d 1137, 1142 (Wyo. 1976).

Curl correctly points out that statements must be "consistent" to merit admission under W.R.E. 801(d)(1)(B). *Montoya v. State*, 822 P.2d 363, 368 (Wyo.1991). However, little supportive case law and less logic is offered to bolster his argument that consistency requires a virtual identity or congruence between the testimony of the principal witness and the subsequent statements.

Professor Mueller points out that "[w]hat seems important is that the exception should not be the means to prove new points not covered in the testimony of the [primary witness]." 4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 405 at 181 (2d ed. 1994). Professor Mueller notes that it is the **consistency,** rather than the substance of the consistent statement, which takes such a statement out of the realm of objectionable hearsay and tends to prove the value of the original statement. *Id.,* § 406 at 194.

 We have, essentially, embraced the foregoing theoretical framework, asserting that consistency itself is what removes such statements from the realm of inadmissible hearsay. *Montoya*, 822 P.2d at 368. Error, if any, may be considered harmless when the content of challenged consistent statements is clearly cumulative of prior testimony. *Id.* Logically, however, material information presented for the first time to support a prior "consistent statement" has no antecedent with which to be consistent or inconsistent and is, therefore, inadmissible.

 Curl complains that Officer Smith offered, impermissibly, **inconsistent** statements from the initial reporting victim, VD, by testifying that when "[Curl] stood behind

[VD], and that when he pushed into him his privates were hard and that he was pushing against his rectum." However, VD told the jury of having to "scoot out" from in front of Curl when the latter was, ostensibly, seeing how tall VD was. Thereafter, VD testified as follows:

> Q. Why didn't you like that, what seemed bad?
>
> [VD]. It felt like he was coming on.
>
> Q. By that, "it felt like he was coming on," did his privates seem hard then?
>
> [VD]. Yeah.
>
> Q. Did that bother you?
>
> [VD]. Yeah.
>
> Q. When did this happen, when you were talking about Playboy? Was this before you looked at the Playboy or after?
>
> [VD]. After.

The only divergence between VD's testimony and that of Officer Smith had to do with pressure against VD's rectum. With the victim's testimony that Curl had an erection and "it felt like he was coming on," Curl is ill-situated to argue that there would be a lesser degree of criminality in rubbing his erection against his youthful victim's hip bone as opposed to the child's rectum. In the absence of allegations of attempted penetration, no material difference exists between the two accounts, the indecency of which is consistent for purposes of W.R.E. 801(d)(1)(B).

■ With similar futility, Curl scores Detective Simmer's testimony that CD had described mutual fondling with Curl as having occurred ten to fifteen times and anal sex a total of five times. That argument ignores CD's testimony to a protracted course of sexual abuse at the hands of his stepfather, stretching back two years to a time when the "family" lived in a mobile home. It also conveniently avoids mention of Dr. Prentice's testimony:

> And [CD] was unable to specifically say how often that molestation had occurred. He estimated, quote, "maybe 15 or 20," unquote. I don't think he could really tell me how many times that that had happened.

The State did not prefer multiple counts against Curl with respect to his stepson, which is not to say such action would have been proper or improper. *See State in Interest of C,* 638 P.2d 165, 173 (Wyo.1981). However, the number of separate assaults is not material to the charge and neither Dr. Prentice's testimony nor that of the police officer could be termed improper, absent the wildest of exaggerations. Testimony of Dr. Prentice and the police officer was, in fact, consistent with the victim's testimony and Curl's complaint here has no practical effect other than to question the State's wisdom in charging but one count as to CD.

Curl offers one "consistent" statement which arguably moves beyond the victim's testimony in a fashion most material to the offense charged, to-wit: Detective Simmer's testimony concerning Curl's conduct towards TS.

### D. SUFFICIENCY OF EVIDENCE REGARDING SEXUAL ASSAULT OF TS

■ Whether Detective Simmer's recapitulation of TS's statements provided inadmissible material elaboration thereon speaks primarily to the sufficiency of the State's case against Curl on the charge of second-degree sexual assault of his daughter. At issue is the element of "[a]ny intrusion, however slight," as defined by Wyo.Stat. § 6–2–301(a)(vii)(A) (1988) and required by Wyo. Stat. § 6–2–303(a) (1988).

■ The appellate test for sufficiency of evidence is whether a rational trier of fact could have been sufficiently armed by the evidence to find the essential elements of the offense beyond a reasonable doubt. *Trujillo v. State,* 880 P.2d 575, 578 (Wyo.1994). In assessing that issue, we view the evidence in a light most favorable to the state, affording them the benefit of all reasonable inferences to be drawn therefrom. *Griffin v. State,* 749 P.2d 246, 248 (Wyo.1988). It is not our task, let alone our place, to reweigh the evidence or reexamine the credibility of the witnesses. *Porth v. State,* 868 P.2d 236, 243 (Wyo.1994).

Only with prompting about her statements to Dr. Schiel did TS tell the jury that Curl had "tried" to put his penis on her vagina.

Curl complains that statements made by TS to Detective Simmer were erroneously admitted pursuant to W.R.E. 801(d)(1)(B) because they provided the missing element of penetration and were, therefore, not consistent with TS's testimony. Further, Curl insists that this error requires reversal of his second-degree sexual assault conviction, as to TS, because there is insufficient competent evidence from which a jury could find guilt beyond a reasonable doubt.

There can be no question of the relative weakness of TS's direct presentation to the jury, particularly as contrasted with the strong and elementally sufficient testimony of her three fellow victims. As a consequence, Curl's attack on the sufficiency of the evidence with respect to TS constitutes his most substantial issue.

However, it was Dr. Schiel, rather than TS, who presented the first and most compelling account of what TS had endured:

> Then I talked to [TS]; I asked her why she was [at the Children's Clinic]. She said her father was doing bad things to her. I asked her what happened, and she indicated that he had been putting his private parts—indicating his penis—into her private parts, and indicated her vagina.

■ The district court properly admitted Dr. Schiel's testimony pursuant to the hearsay exception embodied in W.R.E. 803(4). *Betzle,* 847 P.2d at 1015–19; *cf. White v. Illinois,* 502 U.S. 346, 355–56, 112 S.Ct. 736, 742–43, 116 L.Ed.2d 848 (1992). Therefore, prior to Detective Simmer's testimony, the jury had been presented with: (1) TS's statements to Dr. Schiel that Curl had been putting his penis in her vagina; (2) TS's testimony that Curl had touched her with his hand and "tried" to put his penis on her vagina; and, (3) Dr. Schiel's testimony that a thickening of TS's hymenal diameter, along with a reddening and tenderness of the area between the vagina and the rectum, "were consistent with the history [TS] gave me," i.e., sexual intrusion by Curl.

Whether or not Detective Simmer's testimony was consistent with TS's prior testimony is a question we need not address because the elements of the offense were established by competent testimony before Detective Simmer took the stand. He merely reiterated, in slightly different words, that to which Dr. Schiel had already sworn. It would not have been unreasonable for the jury to conclude that TS was more comfortable, and therefore more forthcoming, in the confidential confines of Dr. Schiel's office than in the forbidding glare of the district court's witness stand.

■ Detective Simmer's testimony was cumulative. Even assuming it was improperly admitted, we cannot say that it tainted the jury's verdict without re-weighing the evidence and re-examining the credibility of the various witnesses. We do not allow ourselves such indulgences. *Porth,* 868 P.2d at 243. Viewing the evidence presented by Dr. Schiel and TS in a light most favorable to the State, it is clear that the jury was afforded sufficient evidence from which to make a reasoned decision that Curl was guilty of second-degree sexual assault upon his daughter.

## IV. CONCLUSION

Sexual deviants who prey upon children depend upon the relative helplessness of their victims to facilitate perpetration while rendering detection and prosecution problematic. To their credit and society's benefit, Curl's young victims had the courage to speak out against their common attacker. To the prosecutor's credit, the problems associated with convicting those who perpetrate sexual assaults upon children left him undeterred from pursuing this case.

A prosecutor, however, has the responsibilities of a minister of justice and not simply that of a zealous no-holds-barred advocate for conviction. Rules of Prof.Cond. for Attorneys at Law, 3.8, cmt. 1. For those who aspire to that calling, the brinkmanship displayed time and again in this case should be viewed with a jaundiced eye. The strength of Curl's young victims would have been betrayed had such prosecutorial risk taking necessitated reversal. The calls were needlessly close. Retrial would have been tantamount to re-victimization.

The jury's verdicts and the judgment of the district court should be, and hereby are, affirmed in all respects.