# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 133

### OCTOBER TERM, A.D. 2021

#### November 29, 2021

DALE L. WARNER,

Appellant
(Defendant),

v.                                                                          S-20-0190

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; H. Michael Bennett, Senior Assistant Appellate Counsel, Corthell and King Law Office, P.C., Laramie, Wyoming. Argument by Mr. Bennett.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Kristen R. Jones, Senior Assistant Attorney General. Argument by Ms. Jones.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Dale Warner, a minor, took guns and ammunition to Sage Valley Junior High School as part of a plan to shoot nine individuals and as many other people as he could. After his plan was thwarted, he was arrested and charged with nine counts of attempted first-degree murder.  Mr. Warner's motion to transfer his case to juvenile court was denied.  Wyo. Stat. Ann. § 14-6-237(b) sets forth seven determinative factors that are to be weighed by the district court in deciding whether to transfer a case to juvenile court. Mr. Warner asserts the district court abused its discretion in weighing the factors under Wyo. Stat. Ann. § 14-6-237(b) because it placed undue weight on a single factor, "[t]he seriousness of the alleged offense . . . ."  We affirm.

## ISSUE

[¶2]    Did the district court abuse its discretion in denying the motion to transfer the case to juvenile court?

## FACTS

[¶3]    At three days old, Mr. Warner was removed from his biological parents and placed in foster care.  For the next eleven years, he was moved from foster home to foster home—over twenty different placements in all—before he arrived at the Warners.  He was adopted by the Warners who later divorced.  After the divorce, Mr. Warner split time between his adoptive parents' homes.

[¶4]    From his early years, Mr. Warner maintained sporadic contact with his biological father, which consisted mostly of occasional phone calls.  On Friday, November 9, 2018, Mr. Warner learned his biological father had died.  He took the news hard and first reacted by attempting suicide.[1]  When he did not succeed, he turned to drugs and alcohol and spent the weekend consuming copious amounts of both.  On Monday, November 12, Mr. Warner returned home to sleep.  After he awoke on Tuesday, he conceived a plan to kill nine specific people and as many others as he could to honor his biological father.  As the plan evolved, it included: obtaining guns and ammunition; hiding his actions from his brother; protecting a friend from being killed or injured by gun shots; and praying that his adoptive family did not get sued as a result of his actions.

[¶5]    Before leaving for school, Mr. Warner sent his brother ahead to the bus stop. Next, he stopped by his adoptive father's truck and grabbed two guns and some

---

[1] The day after learning about the death, Mr. Warner swallowed a full bottle of ibuprofen.  Later that night, he vomited up the pills.  He told Officer Fitzner, a police officer investigating the charges against him, that he then thought about cutting his throat but changed his mind.

1

ammunition. He concealed one gun in his waistband and the other in his duffel bag. He, then, boarded the bus and on the way to school said a prayer to God that his plan—the shooting—would be in his favor and that his adoptive family would not get sued because of his actions. When Mr. Warner got to school, he waved three of his friends over and opened his duffel bag to show them the gun and ammunition. He explained that he was going to kill six classmates and his teacher in his third hour class, the principal, the assistant principal, and anyone else he could. One of these friends shared his third hour class. Mr. Warner told that friend to get down when the shooting started and then threatened to shoot that friend if he told anyone about the plan. After this, Mr. Warner went to his locker and changed into a loose sweatshirt to better conceal the gun in his waistband. He put his duffel bag with the other gun and ammunition in his locker and went to his first hour class.

[¶6] While in first hour, he made two internet searches—one on "How Mass School Shootings Affect the Education of the Students Who Survive" and another on how to go to jail for real. He then left class to go to his locker. On the way, he saw another boy in the hallway and stopped to talk. Mr. Warner told that boy that he planned on getting into trouble during third hour. Confused, the boy asked Mr. Warner to repeat what he had said. Mr. Warner repeated himself and asked the boy if he wanted to see his gun. He did, and Mr. Warner pulled up his sweatshirt revealing the gun tucked into his waistband. Mr. Warner then warned this boy not to tell, and the two returned to their separate classrooms.

[¶7] Shortly thereafter, Mr. Warner's hallway companion reported his conversation with Mr. Warner to Principal Quinn. Principal Quinn went to find Mr. Warner in his first hour class. He sat down next to Mr. Warner and asked if he had a gun. Mr. Warner admitted that he did and allowed Principal Quinn to remove the gun and confiscate the ammunition Mr. Warner was carrying. Principal Quinn escorted Mr. Warner to the athletic director's office and instructed the secretary to call the police. He then left the assistant principal and the athletic director in charge of Mr. Warner while he retrieved the duffel bag from Mr. Warner's locker.

[¶8] Mr. Warner was charged with nine counts of attempted first-degree murder for those potential victims that he specifically identified. Mr. Warner filed a motion to transfer his case to juvenile court. The transfer motion was assigned to another judge.[2] After a two-day hearing, Mr. Warner's motion was denied. Mr. Warner appeals.[3]

---

[2] Mr. Warner's motion to transfer his case to juvenile court was assigned to the Fourth Judicial District Judge John G. Fenn.

[3] Mr. Warner ultimately entered into a plea agreement. The State agreed to dismiss the nine counts of attempted first-degree murder, and in exchange, Mr. Warner pled guilty to two counts of possession of a deadly weapon with unlawful intent and entered a plea of nolo contendere to one count of aggravated assault and battery. He was sentenced to four and one-half to five years imprisonment for each count of

## STANDARD OF REVIEW

[¶9]    Decisions to transfer criminal proceedings from district court to juvenile court are within the sound discretion of the court and our review is for an abuse of discretion. *Sam v. State*, 2017 WY 98, ¶ 10, 401 P.3d 834, 842 (Wyo. 2017) (citing *Hansen v. State*, 904 P.2d 811, 824 (Wyo. 1995)); *see also Sen v. State*, 2013 WY 47, ¶ 9, 301 P.3d 106, 112 (Wyo. 2013).  A district court abuses its discretion when the court's decision "exceeds the bounds of measured reason in light of those matters properly before the court." *Hansen*, 904 P.2d at 824 (citing *Curl v. State*, 898 P.2d 369, 373 (Wyo. 1995)).  The issue is whether the court could "have reasonably concluded as it did." *Thompson v. State*, 2021 WY 84, ¶ 15, 491 P.3d 1033, 1039 (Wyo. 2021) (quoting *Majors v. State*, 2011 WY 63, ¶ 11, 252 P.3d 435, 439 (Wyo. 2011)).

## DISCUSSION

### A.    Transfer Proceedings in Wyoming

[¶10] In Wyoming, cases involving minors who are at least fourteen years old and charged with a violent felony "may be originally commenced either in the juvenile court or in the district court . . . ." Wyo. Stat. Ann. § 14-6-203(f)(iv) (LexisNexis 2021); *JB v. State*, 2013 WY 85, ¶ 6, 305 P.3d 1137, 1139 (Wyo. 2013).  If a minor's case is originally commenced in district court, then the minor may file a motion to have his case transferred to juvenile court.  Wyo. Stat. Ann. § 14-6-237(g); *JB*, ¶ 6, 305 P.3d at 1139. The determinative factors to be considered by the judge in deciding whether the case should be transferred are:

> (i)    The seriousness of the alleged offense to the community and whether the protection of the community required waiver;
>
> (ii)    Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
>
> (iii)    Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted;

---

possession of a deadly weapon with unlawful intent and three to ten years imprisonment on the one count of aggravated assault and battery.  All sentences were to run consecutively.

(iv)    The desirability of trial and disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults who will be charged with a crime;

(v)    The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living;

(vi)    The record and previous history of the juvenile, including previous contacts with the law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this court, or prior commitments to juvenile institutions;

(vii)    The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the juvenile court.

Wyo. Stat. Ann. § 14-6-237(b) (LexisNexis 2021).[4]

## B.    The Parties' Arguments

[¶11]  Mr. Warner appeals the district court's determination that his case should not be transferred to juvenile court.  Mr. Warner relies on *JB*, 305 P.3d 1137.  He argues that the district court abused its discretion in denying his motion to transfer because the court placed undue weight on a single factor, "[t]he seriousness of the alleged offense . . . ."

---

[4] The leading case on juvenile transfer hearings is *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).  In *Kent*, the District of Columbia's juvenile court waived its jurisdiction without a hearing and without applying the factors that the District of Columbia had established to govern the disposition of waiver requests.  *Id.* at 546 n.4, 86 S.Ct. at 1049 n.4.  The Supreme Court held in *Kent* that the juvenile court must have "a statement of the reasons or considerations" accompany its orders to waive jurisdiction.  *Id.* at 561, 86 S.Ct. at 1057.  The District of Columbia's factors were attached to the *Kent* opinion as an appendix and became known as the *Kent* factors.  *Id.* at 566–67, 86 S.Ct. at 1060.  Many states either judicially or legislatively adopted some or all the *Kent* factors.  *Compare State v. Pittman*, 647 S.E.2d 144, 160 (S.C. 2007) (explaining that the court must consider all eight *Kent* factors); *State v. Williams*, 453 P.2d 418, 420 (Wash. 1969) (adopting all eight *Kent* factors), *with* Ark. Code Ann. § 9-27-318(g) (LexisNexis 2021) (enacting a statute with a total of ten factors to be considered by the court with six factors being identical or similar to the *Kent* factors); Tex. Fam. Code Ann. § 54.02(f) (West 2021) (incorporating four *Kent* factors).  The seven statutory factors set forth in Wyo. Stat. Ann. § 14-6-237(b) are similar to the *Kent* factors.  *Compare Kent*, 383 U.S. at 566–67, 86 S.Ct. at 1060, *with* Wyo. Stat. Ann. § 14-6-237(b).

4

The State counters that the district court did not place undue weight on any single factor and did not abuse its discretion. The State contends that the district court weighed all the factors under Wyo. Stat. Ann. § 14-6-237(b) and reasonably concluded that Mr. Warner's case should not be transferred to juvenile court.

## C.    *JB v. State*

[¶12]  In *JB*, JB, a fifteen-year-old boy, stood lookout while two others robbed and attacked two people in their home. *JB*, ¶¶ 1, 3, 305 P.3d at 1138. JB entered the home after the initial attack and struck one of the victims on the head with a dresser drawer.[5] Both of the home's occupants were killed. *Id.* JB was charged in district court with nine felonies including "two counts of first degree murder, two counts of conspiracy to commit first degree murder, two counts of aggravated robbery, two counts of conspiracy to commit aggravated robbery, and one count of first degree arson." *Id.* JB filed a motion to transfer his case to juvenile court which was denied. *Id.* ¶ 4, 305 P.3d at 1138–39.

[¶13]  The dispositive issue in *JB* was whether the district court improperly placed the burden of persuasion to establish whether the case should be transferred on JB rather than on the State. *Id.* ¶ 2, 305 P.3d at 1138. We reversed in accordance with our precedent that the burden of persuasion in transfer hearings is on the State. *Id.* ¶¶ 10, 17, 305 P.3d at 1140–42. JB had also argued that the court placed undue weight on one of the seven statutory factors illustrated by the decision where, four separate times, the district court repeated that "There are no crimes more serious than 'violent felony' crimes in Wyoming." *Id.* ¶ 15, 305 P.3d at 1141. JB contended that the district court failed to balance all seven factors and instead this factor, "the 'seriousness of the alleged offense to the community and . . . the protection of the community,' . . . overwhelm[ed] all other considerations." *Id.* ¶ 15, 305 P.3d at 1141–42. We did not reach this argument, but noted:

> [T]he weight to be given the statutory factors is within the sound discretion of the district court. However, the seriousness of the alleged offense is only one of many statutory factors to be considered when deciding a motion to transfer a case from district court to juvenile court. Undue weight should not be given to any single factor. Wyoming's Juvenile Justice Act provides that cases "in which the minor has attained the age of fourteen (14) years and is charged with a violent felony" may be brought either in the district court or in the juvenile court. Wyo. Stat. Ann. § 14-6-203(f)(iv). This

---

[5] This may have been the killing blow. *JB*, ¶ 3, 305 P.3d at 1138.

is a clear signal from the Wyoming Legislature that not all minors fourteen or older who are charged with violent felonies should be prosecuted in adult criminal court. The fact that a minor is charged with violent felonies does not preclude his case from being adjudicated in juvenile court.

*Id.* ¶ 16, 305 P.3d at 1142. *See also* Wyo. Stat. Ann. § 14-6-237(b). This comment, in response to JB's argument that there was an overemphasis of one of seven factors, served only as a reminder that all the factors must be considered. It was not intended to control the trial court's discretion in determining the weight to be afforded any given factor. *Cf. Sam*, ¶¶ 19–20, 401 P.3d at 845–46; *Hansen*, 904 P.2d at 828 ("[U]nless there is absolutely no evidence to support [the court's] conclusions, the manner in which [the court] weighs the evidence does not manifest an abuse of discretion."); *see also* cases dealing with other balancing tests, generally: *Mayhew v. State*, 2019 WY 38, ¶ 27, 438 P.3d 617, 624 (Wyo. 2019) (404(b) evidence); *Garrison v. State*, 2018 WY 9, ¶ 20, 409 P.3d 1209, 1215 (Wyo. 2018) (same); *Griggs v. State*, 2016 WY 16, ¶ 128, 367 P.3d 1108, 1143 (Wyo. 2016) (same); *Lafferty v. State*, 2016 WY 52, ¶ 44, 374 P.3d 1244, 1252 (Wyo. 2016) (constitutional speedy trial); *Davis v. State*, 2018 WY 40, ¶ 54, 415 P.3d 666, 684 (Wyo. 2018) (juvenile sentencing).

## D.     The District Court's Analysis

[¶14] Here, after a two-day transfer hearing where it received exhibits and heard testimony from twelve witnesses, the district court denied Mr. Warner's motion to transfer his case to juvenile court. The district court thoroughly and thoughtfully weighed each of the seven statutory factors.

[¶15] Applying the first factor—"[t]he seriousness of the alleged offense to the community" and "the protection of the community,"[6] Wyo. Stat. Ann. § 14-6-237(b)(i)—the court found that Mr. Warner's charged offenses, nine counts of attempted first-degree murder, were "extremely serious." The court explained:

> Thankfully, no one will ever know if the Defendant would have gone through with his plan if [the student] had not gone to Principal Quinn or if Principal Quinn had not intervened so perfectly. However, what is known is that the Defendant brought guns and ammunition to school with the intent to kill his teacher and most of the other students in his

---

[6] The district court did not mention the protection of the community in its analysis of this factor. Its reasoning on the protection of the community is contained in its analysis of the seventh factor. *See infra* ¶ 21.

third hour class, along with Principal Quinn and Assistant Principal Miller. The Defendant had the means to carry out his plan, and although he told several students of his plan, he also threatened them to keep quiet or they too could become his targets. The Defendant also told Officer Fitzner that he wanted to kill students more than he wanted to get caught before he had been able to kill anyone.

The court weighed this factor against transfer.

[¶16] The court analyzed the second factor—"[w]hether the alleged offense was committed in an aggressive, violent, premediated or willful manner," Wyo. Stat. Ann. § 14-6-237(b)(ii)—and found:

> The Court finds that the facts discussed above[7] support that the charged offenses were intended to be carried out in an aggressive, violent, premeditated, and willful manner. The Defendant formed a plan to kill the teacher and other students in his third hour class, then shoot Principal Quinn and Assistant Principal Miller, and then continue shooting until he ran out of bullets. The Defendant then took steps to carry out that plan. The fact that no one was hurt due to the intervention of a third party does not diminish the aggressive, violent, and premeditated nature of the offenses.

This factor weighed against transfer.

[¶17] On the third factor—"[w]hether the alleged offense was against persons or against property . . . ," Wyo. Stat. Ann. § 14-6-237(b)(iii)—the court found:

> There is no dispute that the alleged offenses were against specifically identified persons. In addition, the

---

[7] Mr. Warner made several arguments regarding premediation that the court discussed. First, he argued he could not form premeditated plans because a juvenile's brain is different from an adult's. The court explained that "[a]lthough science and the law recognize that a juvenile's brain is different from an adult's and juveniles tend to be more impulsive, it does not necessarily follow that a juvenile cannot form premeditated thoughts and plans." Second, Mr. Warner argued that he was incapable of forming a premeditated plan because of his substance use from the previous weekend. The court found that he "was capable of forming premeditated plans." Finally, Mr. Warner argued that he did not act in a premeditated manner because he had developed the plan when he woke up on the morning of the incident. The court found that premeditation "does not require [Mr. Warner] to have spent days, weeks, or months forming his plan . . . ," and Mr. Warner's own words showed he had formed the required intent.

Defendant's plan could have resulted in the injury or death of other unnamed students or staff members. Fortunately, no one was actually injured in this case due to the intervention of a third party. However, the Court cannot ignore the fact that the Defendant's plan carried a high risk of injury or death to the students and staff at the junior high.

The court weighed this factor against transfer.

[¶18] The court concluded the fourth factor—the "disposition of the entire offense in one (1) court when the juvenile's associates in the alleged offense are adults . . . ," Wyo. Stat. Ann. § 14-6-237(b)(iv)—was inapplicable as Mr. Warner acted alone.

[¶19] In evaluating the fifth factor—"[t]he sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living," Wyo. Stat. Ann. § 14-6-237(b)(v)—the court first considered Mr. Warner's childhood:

> The Defendant was fourteen (14) when the charged offenses occurred. The Defendant had been removed from his biological parents' home when he was just three (3) days old due to neglect. . . . The Defendant was placed in over twenty (20) foster care placements. . . . The Defendant had very little contact with either of his biological parents after the age of six (6). The Defendant was placed with the Warners around the age of ten (10) or eleven (11). The Warner[s] divorced about a year after the Defendant's adoption, and he was living back and forth between their homes at the time of the incident. The Defendant had become disrespectful to [Mrs.] Warner in the months leading up to the incident, and he had begun experimenting with substance abuse. The Defendant had also attempted suicide on at least one occasion prior to the incident.

The court then discussed Mr. Warner's level of sophistication and maturity:

> The evidence that was presented at the hearing and in the attachments to the motion and the State's objection demonstrates that the Defendant was not as unsophisticated and immature as Dr. Geer's claims. For example, . . . one of the consequences the Defendant considered was the possibility of his family being sued as a result of his actions.

8

This was a sophisticated and mature consequence for the Defendant to have considered. The Defendant also told multiple people that he knew he would go to jail for what he was planning to do, and that he was intentionally seeking that consequence. The Defendant was also sophisticated enough to take steps to avoid detection. He sent his brother to the bus stop before obtaining the guns. He concealed at least one of the guns and most of the ammunition in the duffel bag. He changed his sweatshirt so that it would better conceal the gun in his waistband.

The court concluded that "[a]lthough it is undisputed that the Defendant had a traumatic upbringing, the evidence shows that he had the sophistication and maturity to form a premeditated plan and to understand the consequences of his actions" and weighed this factor against transfer.

[¶20] In analyzing the sixth factor—"[t]he record and previous history of the juvenile . . . ," Wyo. Stat. Ann. § 14-6-237(b)(vi)—the court found Mr. Warner had never previously been adjudicated as a delinquent in juvenile court. The court explained:

[T]he Defendant does have an extensive CPS history in South Dakota. Although these records were not admitted, it appears that the Defendant received counseling and medication for his mental health diagnoses through the CPS case. The Court does not know what other services the Defendant received through the juvenile case(s) in South Dakota.

The court weighed the sixth factor slightly in favor of transferring the case to juvenile court.

[¶21] In weighing the seventh factor—"[t]he prospects for adequate protection of the public and the likelihood of reasonable rehabilitation . . . ," Wyo. Stat. Ann. § 14-6-237(b)(vii)—the court considered testimony indicating that Mr. Warner had the potential for rehabilitation.

The Defendant offered the testimony of Kara Big Crow, Jeff Iron Cloud, Dr. Gibson, and Dr. Geer, who all opined that they believe the Defendant has the potential to be rehabilitated. These opinions were largely based on the witnesses' limited interactions with the Defendant. Many of these witnesses believed that the Defendant was receptive to change, and that he [had] already undergone some emotional growth while they had been working with him. These

witnesses also testified that the Defendant has expressed great remorse. Similarly, Principal Quinn testified that he believed the Defendant should be tried as a juvenile. Principal Quinn's opinion carried great weight with the Court. However, Principal Quinn admitted that he formed his opinion without knowing all of the facts.

. . .

Although most of the evidence about the Defendant's capacity for rehabilitation was presented through unsupported opinions, the State did not present any evidence that the Defendant is so far gone that he cannot possib[ly] be rehabilitated.

The court found that *if* the seventh factor rested solely on the likelihood of rehabilitation, then this factor would likely weigh in favor of transferring his case to juvenile court. The court *then* balanced the likelihood of rehabilitation against the prospect for adequate protection of the public.

The evidence established that it is highly likely that the Defendant would not be under the supervision of the juvenile court until he was twenty-one (21). The practical reality of our juvenile system is that he would stop receiving services at age eighteen (18), less than three (3) years from now. Further, according to Ms. Duvall, the Boy's School is the only "lockdown" placement in the juvenile system, and it is likely that the Defendant would be at the Boy's School for twelve (12) to eighteen (18) months. This detention could end sooner if the Boy's School felt like there were no more services to offer to the Defendant. He would then likely be returned to the community under the supervision of his parents and a probation officer. The Defendant was under the supervision of his parents at the time the incident occurred. Similarly, the oversight of a probation officer does not provide much comfort in this case. Although Ms. Duvall testified that there are sanctions that can be imposed if a juvenile's behavior "escalates," in the Defendant's case he escalated from substance abuse and self-harm to attempted first degree murder over the course of a weekend. Thus, the Defendant poses a threat to society that may not be appropriately managed through probation.

10

The court weighed the seventh factor against transfer.

[¶22] The district court weighed five factors against transfer, one as neutral, and one slightly in favor of transfer. In balance, the district court concluded that the factors weighed against transfer. Our role is to determine whether the trial court abused its discretion in considering the required factors. *See, e.g.*, *Griggs*, ¶ 128, 367 P.3d at 1143 (considering factors weighed in determining whether to admit evidence pursuant to W.R.E. 404(b)). Here, the district court identified the appropriate factors for examination as required by Wyo. Stat. Ann. § 14-6-237(b). The court set forth its factual findings regarding each factor and applied appropriate legal considerations to those findings. While the district court afforded weight to the seriousness of Mr. Warner's alleged offenses, it did not place undue weight on that factor. The court's decision was within "the bounds of measured reason." *Hansen*, 904 P.2d at 824 (citing *Curl*, 898 P.2d at 373). We find no abuse of discretion.

## *CONCLUSION*

[¶23] The district court thoughtfully analyzed and weighed all applicable factors under Wyo. Stat. Ann. § 14-6-237(b). The court did not abuse its discretion in denying Mr. Warner's motion to transfer. We affirm.